**\*NOT FOR PUBLICATON\***

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| ADVANCED ORTHOPEDICS AND SPORTS MEDICINE INSTITUTE, P.C., <br><br> Plaintiff, <br><br> v. <br><br> OXFORD HEALTH INSURANCE, INC., <br><br> Defendant. | Civil Action No. 21-17221 (FLW) <br><br> **OPINION** |

**WOLFSON, Chief Judge:**

This action arises out of a payment dispute between a health insurance company and an out-of-network provider for surgical services. Plaintiff, Advanced Orthopedics and Sports Medicine Institute, P.C. ("Advanced Orthopedics" or "Plaintiff"), alleges that defendant Oxford Health Insurance Inc., ("Oxford" or "Defendant") failed to reimburse Plaintiff in full for surgery performed on Oxford's insured. Pending before the Court is Defendant's motion to dismiss the Complaint for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6). For the reasons stated below, Defendant's motion is **GRANTED**. To the extent Plaintiff believes it can supply additional facts to cure the deficiencies in its claims, discussed below, Plaintiff is given leave to amend its complaint within 30 days from the date of this Opinion and the accompanying Order.

**I.      FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

The following facts are taken from Plaintiff's Complaint and are presumed to be true for the purpose of this Motion. Plaintiff Advanced Orthopedics is a New Jersey based corporation engaged in the practice of orthopedics and sports medicine. (Compl. ¶ 1.) Defendant Oxford is a

1

New York corporation authorized to operate as a health insurance company in New Jersey. (*Id.* ¶ 2.) In relation to Defendant's insurance plans, Plaintiff is a not a participating provider, but rather, together with its clinical staff, are non-participating or out-of-network providers. (*Id.* ¶ 12.)

Plaintiff's claims arise out of a dispute over the amount Oxford reimbursed Advanced Orthopedics for a surgery performed on Oxford's insured, "K.G." On August 8, 2016, K.G. was admitted to CentraState emergency room due to severe pain in her left leg. (*Id.* ¶ 13.) Dr. Goldberg, M.D., the on-call orthopedic specialist, examined K.G., and found severe weakness of the left tibialis interior and EHL, positive SLR on the left side, and decreased sensation in the left dermatomal distribution. (*Id.*) MRIs of the lumbar and thoracic spine revealed L4-5 disk herniation with a foraminal component at level L5. (*Id.* ¶ 14.) Because of the foraminal component of K.G.'s herniation, Dr. Goldberg recommended a complete facetectomy and stabilization with a complete diskectomy. (*Id.* ¶ 16.) Prior to the surgery, CentraState allegedly contacted Oxford and obtained pre-authorization tendered under the confirmation number 108221092. (*Id.* ¶ 17.) The precertification authorization letter attached to Defendant's motion to dismiss states in pertinent part:

> **In-Network[1] Precertification Exception Disclaimer**
>
> **Payment Determinations Will Be Made Upon Receipt of a Claim**
> *What does this mean to me?*
>
> We evaluated the requested services based on medical necessity and the Member's health benefits plan. Reimbursement is determined after services are rendered and a claim is submitted. Therefore, this approval does not guarantee payment. Upon receipt of the claim,

---

[1] The pre-authorization letter acknowledges that "[t]he requested in-network exception has been granted [such that] reimbursement for the listed services will be reimbursed in accordance with the Member's in-network benefits (including in-network copayment, deductible and/or coinsurance)." (Pre-authorization Letter, p. 2.)

> we will assess whether the service codes listed above[2] are eligible for payment.
>
> **Payment is based on the following:**
> - Member enrollment and eligibility
> - Terms, conditions, exclusions and limitations of the Member's health benefit plan
> - Oxford administrative and payment policies (For more information on all of our payment policies, please visit our website at www.oxfordhealth.com.) (Pre-authorization Letter Dated August 10, 2016 ("Pre-authorization Letter"), pp. 1-2.)[3]

On August 10, 2016, Dr. Goldberg and Timothy Dowse, P.A., performed the preauthorized surgery on K.G. After the procedure, Advanced Orthopedics billed Oxford $269,859.50, which according to Advanced Orthopedics, represented its usual, customary, and reasonable ("UCR") fee. (*Id*. ¶¶ 21, 23.) Oxford allegedly paid Advanced Orthopedics $4,671.36, purportedly leaving K.G. with an out-of-pocket bill of $265,188.14 pursuant to the Explanation of Benefits (EOBs) K.G. received from Oxford.[4] (*Id*. ¶ 23.) Advanced Orthopedics allegedly appealed the payment on behalf of K.G. on several occasions, but was advised that its appeals were "untimely" and that it was not authorized to appeal on behalf of K.G. (*Id*. ¶¶ 24-25.) After allegedly exhausting its administrative remedies, Advanced Orthopedics filed a complaint against Oxford asserting the following state common law causes of action: (1) breach of implied contract; (2) breach of warranty of good faith and fair dealing; (3) promissory estoppel; and (4) unjust enrichment. In

---

[2]   The pre-authorization letter states "Emergent inpatient hospital admit" following the text "Description of Service Code(s)" at the top of the letter. (Pre-authorization letter, p. 1.)
[3]   The Court may consider the pre-authorization letter attached to Defendant's motion because it is integral to the pleadings. *See Angstadt v. Midd-W. Sch. Dist.*, 377 F.3d 338, 342 (3d Cir. 2004).
[4]   Plaintiff also contends, however, that "under New Jersey law, K.G. must be held harmless for all charges over and above any applicable in-network cost-sharing amounts, i.e., deductibles, co-payments, and co-insurance, for: (i) emergency services, regardless of whether by participating or non-participating providers, N.J.A.C. 11:4-37.3(b)(2); and (ii) services rendered in a network hospital like CentraState, even when the admitting physician is out-of-network, N.J.A.C. 11:22-5.8." (Compl. ¶ 20.)

short, Advanced Orthopedics argues that despite Oxford's preauthorization and prior course of dealings, Oxford refused to pay Advanced Orthopedics' UCR fee for surgical services rendered by its clinical staff at CentraState hospital in August 2016. (*Id*. ¶ 21.) Thereafter, Oxford filed a motion to dismiss. (ECF No. 11., Defendant's Motion to Dismiss ("Def. Mot. to Dismiss").)

## II.     LEGAL STANDARD

Under Rule 12(b)(6), a court may dismiss an action if a plaintiff fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). When reviewing a Rule 12(b)(6) motion, courts "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (quoting *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)). A complaint survives a motion to dismiss if it contains sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

To determine whether a complaint is plausible, courts in the Third Circuit conduct a three-step analysis. *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010). First, the court "takes note of the elements a plaintiff must plead to state a claim." *Id*. (quoting *Iqbal*, 556 U.S. at 675). Second, the court identifies allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." *Id*. at 131 (quoting *Iqbal*, 556 U.S. at 679). Third, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." *Santiago*, 629 F.3d at 131 (quoting *Iqbal*, 556 U.S. at 680). This last step is a "context-specific task that requires the [ ] court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

Generally, the court may not "consider matters extraneous to the pleadings" when considering a motion to dismiss. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (citation omitted). However, the court may consider (1) exhibits attached to the complaint, (2) matters of public record, and all "document[s] integral to or explicitly relied upon in the complaint" without converting the motion to dismiss into one for summary judgment. *Angstadt v. Midd–West Sch. Dist.*, 377 F.3d at 342 (quoting *U.S. Express Lines, Ltd. v. Higgins*, 281 F.3d 383, 388 (3d Cir. 2002)).

### III.   DISCUSSION

#### A.   Express Preemption of Plaintiff's State Law Claims

Defendant argues that the Complaint should be dismissed because ERISA preempts all of Advanced Orthopedics' claims, and even if preemption does not apply, the claims fail as a matter of state law. (*See* Def. Mot. to Dismiss, pp. 4-16.) In 1974, Congress enacted ERISA to "provide a uniform regulatory regime over employee benefit plans" to lessen administrative burdens and reduce employers' costs. *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004). To ensure exclusive federal regulation of employee welfare benefit plans, such that plans were not burdened with the administrative cost of complying with numerous, potentially conflicting state laws, Congress inserted in the statute an expansive preemption provision, codified at § 514(a). *See* 29 U.S.C. § 1144(a); *Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 321 (2016); *Alessi v. Raybestos–Manhattan, Inc.*, 451 U.S. 504, 522–23 (1981). Congress also put in place a complementary statutory provision, § 502, which created a federal cause of action for plan beneficiaries and participants to recover benefits due under the plan or enforce its terms. 29 U.S.C. § 1132(a)(1)(B).

Section 514(a) preempts "any and all State laws insofar as they may now or hereafter *relate to* any [ERISA] employee benefit plan." 29 U.S.C. § 1144(a) (emphasis added). The scope of

"[s]tate laws" that may "relate to" an ERISA plan encompasses "all laws, decisions, rules, regulations, or other State action having the effect of law, of any State." 29 U.S.C. § 1144(c)(1). This also applies to common law causes of action. *See Menkes v. Prudential Ins. Co. of Am.*, 762 F.3d 285, 294 (3d Cir. 2014).

Observing that "[if] 'relate to' were taken to extend to the furthest stretch of its indeterminacy, . . . pre-emption would never run its course," *N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995), the Supreme Court fashioned a functional test for express preemption to guide lower courts.  Specifically, the Supreme Court has instructed that a state law "relates to" an employee benefit plan if it (1) "has a 'reference to' ERISA plans" or (2) if it "has an impermissible 'connection with' ERISA plans." *Gobeille*, 577 U.S. at 319–20 (citations omitted).  A state law has a "reference to" an ERISA plan when it "acts immediately and exclusively upon ERISA plans . . . or where the existence of ERISA plans is essential to the law's operation." *Id.* (alterations in original) (citation omitted).  On the other hand, an "impermissible connection" is found where state laws "govern[] . . . a central matter of plan administration or interfere[] with nationally uniform plan administration." *Id.* (internal quotation marks and citations omitted).

In turn, the Third Circuit has advised that a state law claim will make an impermissible "reference to" an insurance plan when (1) "the existence of an ERISA plan is a critical factor in establishing liability," *Ingersoll-Rand*, 498 U.S. at 139–40; or (2) the court's examination will "require interpreting the plan's terms." *Menkes*, 762 F.3d at 294; *see also 1975 Salaried Ret. Plan for Eligible Employees of Crucible, Inc. v. Nobers*, 968 F.2d 401, 406 (3d Cir. 1992).  As to the "impermissible connection" definition, the Third Circuit has explained that a state law claim has a "connection with" an insurance benefits plan when (1) the claim "directly affect[s] the

6

relationship among the traditional ERISA entities—the employer, the plan and its fiduciaries, and the participants and beneficiaries," *Plastic Surgery Ctr., P.A. v. Aetna Life Ins. Co.*, 967 F.3d 218, 235 (3d Cir. 2020) (citations omitted); (2) is dependent upon a plan's administration, *Menkes*, 762 F.3d at 295–96; or (3) is at odds with ERISA's purpose. *National Sec. Systems, Inc. v. Iola*, 700 F.3d 65, 84–85 (3d Cir. 2018); *Kollman v. Hewitt Associates, LLC*, 487 F.3d 139, 149 (3d Cir. 2007).

Here, Plaintiff asserts four state common law causes of action: (1) breach of implied contract; (2) breach of warranty of good faith and fair dealing; (3) promissory estoppel; and (4) unjust enrichment. In its breach of contract claim, Plaintiff alleges that Oxford's course of conduct, prior dealings, and the circumstances underlying the insured's treatment, gave rise to an implied contract in which Oxford would pay Plaintiff for the preauthorized services provided by Dr. Goldberg and Mr. Dowse, and Oxford breached such contract by failing to pay the entire bill for the services provided. (Compl. ¶¶ 29, 32-33.) The breach of warranty of good faith and fair dealing claim alleges that Oxford engaged in "acts of commission and omission that were wrongful and without justification." (*Id*. ¶ 37.) Similar to the breach of contract claim, the promissory estoppel claim alleges that Oxford promised to pay for the pre-authorized services at Advanced Orthopedics' UCR fee, and Plaintiff subsequently relied on such alleged promise to its detriment. (*Id*. ¶ 40, 42.) Finally, in asserting an unjust enrichment claim, Plaintiff pleaded that Oxford "enriched itself unjustly" at the expense of Plaintiff, because it retained a benefit in the form of rendered services that remain underpaid. (*Id*. ¶ 46.) Significantly, each claim rests on the presumption that Oxford acted in such a manner that was inconsistent with Advanced Orthopedics' expectations of renumeration arising out of an alleged agreement or promise separate from the terms of the insured's plan. I disagree.

Each of Plaintiff's common law claims "relate" to K.G.'s ERISA plan. Plaintiff argues that Advanced Orthopedics does not seek to enforce the terms and conditions of the insurance policy through which K.G. was insured, but rather is deserving of payment at the UCR rate based on its reliance on preauthorization obtained from Oxford, its prior course of conduct in dealing with Oxford, its understanding of New Jersey law with respect to mandatory coverage of emergency medical circumstances, and the circumstances underlying K.G.'s treatment. (Brief. in Opposition to Defendant's Motion to Dismiss ("Br. in Opp'n."), p. 1.)

As to pre-authorization, Advanced Orthopedics avers that it reasonably relied upon Oxford's preauthorization with the understanding that it would receive payment of 100% of Advanced Orthopedics' UCR charges. According to Plaintiff's complaint, "CentraState contacted [Oxford] and obtained pre-authorization for Dr. Goldberg, with Timothy Dowse, P.A." to perform the surgery. (Compl. ¶ 17.) Pre-authorization was "tendered under confirmation number 108221092." (*Id*.) However, the contents of the pre-authorization letter belie Plaintiff's allegation that Oxford promised to pay the UCR rate.

The letter does not refer to Plaintiff's usual and customary rate for services rendered. Instead, as stated above, the written pre-authorization expressly states that "payment is based on . . . [t]erms, conditions, exclusions and limitations of the Member's health benefits plan[.]" (Pre-authorization Letter, p. 1.) What is more, the letter disclaims any promise of payment in stating that the "approval does not guarantee payment" and only "[u]pon receipt of the claim, [] will [Oxford] assess whether the service codes listed above are eligible for payment." (*Id*. at p. 2.) Therefore, the determination of Plaintiff's eligibility for payment in the first instance, and the subsequent amount of any payment, rest not on the terms of an independent agreement, but on a

8

plan-based obligation—*i.e.*, the plan's terms, conditions, exclusions, and limitations. Accordingly, as alleged, the claims as pleaded are for benefits due under an employee benefit plan.

Several courts, including this Court, have rejected the same "independent" pre-authorization agreement argument when presented with the contents of pre-authorization letters attached to motions to dismiss. In *Atlantic Shore Surgical Associates v. Horizon Blue Cross Blue Shield*, the plaintiff similarly argued that "Horizon, by agreeing to preauthorize the procedure, created a quasi-contract that bound Defendants to reimburse Plaintiffs at a reasonable and customary rate." No. 17-07534, 2018 WL 2441770, at *6 (D.N.J. May 31, 2018). However, similar to the contents of the pre-authorization letter in the instant case, the preauthorization agreement in *Atlantic Shore Surgical Associates* merely authorized performance of the procedure based on medical necessity and disavowed any guarantee of payment. *See id*. ("This authorization determines the medical necessity of the services requested that require authorization are based upon the information provided. It is NOT a guarantee of payment. It is issued subject to the terms . . . of the member's benefit plan . . . .") Thus, this Court found that the plaintiff's claims were only resolvable by interpreting the member's plan, not any independent contract, and any right to recovery would depend entirely on the terms and provisions of the plan which set forth the reimbursement rate for out-of-network providers. *Id*.

Other courts in this district have also recognized that pre-authorization letters, such as the one here, undermine allegations of independent agreements that do not arise from a health benefits plan. *See, e.g., Glastein v. Horizon Blue Cross Blue Shield of Am.*, No. 17-7983, 2018 WL 3849904, at *3 (D.N.J. Aug. 13, 2018) (finding plaintiff's state common law claims, including claims for breach of contract and promissory estoppel, preempted where a precertification authorization cautioned that payment was subject to the terms of the benefit plan); *Comprehensive*

*Spine Care, P.A. v. Oxford Health Ins., Inc.*, No. CV 18-13874, 2019 WL 2498925, at *4 (D.N.J. June 17, 2019) (holding that plaintiff's common law claims relate to an ERISA plan where Oxford precertification letter also stated that it did not "guarantee payment," but based payment on "[t]erms, conditions, exclusions and limitations of the Member's health benefits plan[.]"); *E. Coast Advanced Plastic Surgery v. Aetna Inc.*, No. 18-9429, 2019 WL 2223942, at *3 (D.N.J. May 23, 2019) ("Critically, however, the letter nowhere indicates that [the insurer] will pay the usual and customary fees of [the provider] . . . . Instead, the preauthorization letter indicates that if certain criteria are not satisfied, then [the insurer] may not pay 'benefits[.]'").

Plaintiff argues, however, that the Third Circuit's decision in *Plastic Surgery Center* is dispositive in this case. Advanced Orthopedics' reliance on *Plastic Surgery Center*, however, is misplaced. In *Plastic Surgery Center*, the Third Circuit addressed the issue of express preemption under ERISA in the context of compensation for services provided to patients by out-of-network providers. There, the plaintiff, a medical provider, asserted various state law claims against the defendant insurer, arising from oral agreements between the parties to render plastic surgery services not covered by the terms of the insureds' plans. *Plastic Surgery Ctr., P.A.*, 967 F.3d at 229. Specifically, two patients sought medical procedures for breast reconstruction surgery and facial reanimation surgery, respectively, from a practice specializing in plastic and reconstructive surgery that were not available in-network. *Id*. at 223. The first insured's plan provided out-of-network benefits only in cases of urgent care or a medical emergency[5] and the second insured's plan did not provide out-of-network benefits at all. *Id*. As a result of the insureds' lack of coverage, the provider contacted the insurer to confirm that it would be compensated before providing care.

---

[5] In the first insured's case, bilateral breast reconstruction surgery following a double mastectomy did not fall into either category. *Id*.

10

*Id*. at 224. In the first insured's case, the insurer agreed to pay a "reasonable amount" over the telephone. *Id*. And in the second insured's case, the insurer verbally confirmed that the provider would be paid at the "highest in[-]network level." *Id*. Despite the agreements, the insurer allegedly refused to compensate the medical provider at the agreed upon amounts after the plastic surgery services were provided. Consequently, the plaintiff alleged breach of contract, promissory estoppel, and unjust enrichment claims, which the defendant moved to dismiss as preempted under ERISA.

The Third Circuit found that the plaintiff's breach of contract and promissory estoppel claims did not "relate to" an ERISA plan, because the parties' "oral agreements" gave rise to a freestanding contract which defined the scope of the medical procedures the plaintiff agreed to perform, and the amount that the defendant promised to provide in exchange for those services. *Id*. at 231–32. However, as to the plaintiff's unjust enrichment claim, the Third Circuit reached a different conclusion. Unjust enrichment claims require a litigant to plead that a defendant received a benefit for which it never paid. And, in the case of an insurer, the Third Circuit observed that the "benefit conferred" is the discharge of an insurer's obligation to an insured. *Id*. at 240. Thus, the Third Circuit found that the plaintiff's unjust enrichment was preempted, as it was "premised on the existence of" a plan. *Id*.

The Third Circuit also explained that whether plaintiff sought to "enforce obligations independent of the plan turns on whether the parties (i) agreed that [the insurer] would provide payment for all services necessary to perform the respective surgeries, leaving only the *amount* of the payment pegged to the terms of the plan; or (ii) that the scope of coverage, as well as payment, would be limited to the terms of the plans—leaving open the possibility that some services would not be compensated at all." *Id*. at 231. The court rejected the insurer's argument that the latter

11

scenario applied, observing that (1) the respective plans did not provide for out-of-network coverage; and (2) as pleaded, the parties agreed that the providers would "perform the surgeries and related medical care in exchange for payment from [the insurer] of a 'reasonable amount' under [one insured's] plan and at the 'highest in[-] network level' under [the other insured's] plan for all component services . . . ." *Id*.

In particular, in the case of the first patient, the provider alleged that an agreement was struck during telephone conversations that the insurer would pay "a reasonable amount" for breast reconstruction surgery that was not covered in-network and did not meet the plan's exception for out-of-network coverage for medical emergencies. *Id*. at 223. With respect to the second patient, contemporary notes documented that the insurer agreed to "approve and pay for" the insured's facial reanimation surgery at the "highest in[-]network level." *Id*. at 224. In both cases, the Third Circuit determined that it was "[The insurer's] oral offers or oral promises (as the case may be) rather than the terms of the plan that define the scope of [the insurer's] duty." *Id*. at 233.

Plaintiff further argues that the Third Circuit in *Plastic Surgery Center* plainly held that state common-law claims brought by out-of-network providers seeking damages related to pre-service course of dealings with ERISA plans are not expressly preempted. (*See* Br. in Opp'n., pp. 1-2, 5.) In reaching its decision in *Plastic Surgery Center*, however, the Third Circuit stressed that its holding did not "suggest that out-of-network providers are categorically exempt from section 514(a), with carte blanche to file suit for services rendered to plan participants." *Id.* at 232 n. 16. Indeed, the Third Circuit instructed that "[w]hether any agreement was reached with a provider, and the extent to which the terms of that agreement are so intertwined with the plan as to 'relate to' an ERISA plan, are questions that depend on the facts and circumstances of the given case." *Id*.

12

In this case, not only are there no allegations of oral promises to pay a certain amount, but the pre-authorization letter unequivocally states that "approval does not guarantee payment" and that further assessment will take place to determine whether the service codes are "eligible for payment." (Pre-authorization Letter, p. 1.) Moreover, it appears that K.G.'s health benefit plan covers services rendered by out-of-network providers. (*See* Certification of Maryann Britto, dated October 22, 2021 ("Oct. 22 Britto Cert.") ¶ 2; Exhibit 1 ("Health Benefit Plan"), p. 20.) Thus, in contrast to the insureds in *Plastic Surgery Center*, here, "the scope of coverage, as well as payment, would be limited to the terms of the plans—leaving open the possibility that some services would not be compensated at all." *Plastic Surgery Ctr., P.A.*, 967 F.3d at 231.

Furthermore, although Plaintiff also relies on other non-binding district court decisions that have found no-preemption of similar common law claims, the parties in those cases did not attach the disputed pre-authorization letters for the courts' consideration. *See, e.g.*, *MedWell, LLC v. Cigna Corp.*, No. 20-10627, 2021 WL 2010582, at *6 (D.N.J. May 19, 2021); *Small v. Oxford Health Ins., Inc.*, No. 18-13120, 2019 WL 851355, at *9 (D.N.J. Feb. 21, 2019). Additionally, those cases are also factually distinguishable from this case. As an example, in *MedWell*, the facts include allegations of a 15-year relationship between the provider and the insurer during which for several years the insurer would review the claims submitted by the provider and subsequently pay the provider for the services rendered. *Medwell*, 2021 WL 2010582, at *1. The insurer stopped paying for services after an audit revealed that it was allegedly entitled to a refund. *Id*. Here, although Plaintiff argues that it reasonably understood the pre-authorization of services to contemplate payment of 100 percent of its UCR charges based on its "prior course of dealing with [Oxford] over several decades," there are no additional allegations in the complaint regarding the alleged prior course of dealing that support routine reimbursement of the UCR fee. (Compl. ¶ 21.)

And, more importantly, the pre-authorization letter itself undermines any alleged expectation of reimbursement at the UCR rate.

In *Small*, the court found that the plaintiff's claims were not expressly preempted by ERISA, because the complaint sought damages stemming from an independent relationship between the insurer and provider. 2019 WL 851355, at * 4. Contrary to the facts alleged here, however, in *Small*, an agent of the insurer allegedly contacted the provider at some point after the surgery and offered an additional sum if the provider forgave the remaining balance of the surgery. *Id*. at *1. The provider also purportedly accepted the agreement which was allegedly memorialized in writing. *Id*. In this case, there are no allegations of an oral agreement, let alone allegations of a written or oral agreement to pay a specified amount.

Plaintiff also relies on *Comprehensive Spine Care, P.A. v. Oxford Health Ins., Inc.* which found that state common law claims did not "relate to" an ERISA-regulated plan because nothing in the amended complaint "direct[ed] the [c]ourt to consider the terms of the [insured's] benefit plan in any way." No. 18-10036, 2018 WL 6445593, at *4 (D.N.J. Dec. 10, 2018). Instead, the court observed that the plaintiff's amended complaint sought damages arising from an independent relationship between the plaintiff and defendants. *Id*. However, in its preemption analysis, the court noted that other courts in this district have found state law claims asserted by healthcare providers against insurance companies to be preempted by § 514. In that regard, the court distinguished those cases from the one before it on the basis that these other cases—as does the case before me—considered claims arising from "preauthorization letters that expressly stated that preauthorization was subject to the terms of an ERISA benefit plan, therefore requiring a court to interpret the plan in order to resolve the dispute." *Id*. at *4. As explained *infra*, the pre-authorization letter references an ERISA plan such that no independent agreement arises in this

14

case. In *Comprehensive Spine Care, P.A.*, on the other hand, the court did not have the terms of the written pre-authorization letter before it.[6] *Id.*; *Compare Comprehensive Spine Care, P.A. v. Oxford Health Ins., Inc.*, No. 18-10036, 2018 WL 6445593, at *5 (D.N.J. Dec. 10, 2018) (finding no preemption because "nothing in the Amended Complaint direct[ed] the Court to ERISA or an ERISA plan") *with* *Comprehensive Spine Care, P.A. v. Oxford Health Ins., Inc.*, No. 18-13874, 2019 WL 2498925, at *4 (D.N.J. June 17, 2019) (finding preemption where the plaintiff's complaint relied on a written preauthorization, which expressly stated that it did not guarantee payment and made payment contingent on the terms of an ERISA plan).

Here, the central allegation at the heart of Plaintiff's implied contract, breach of warranty of good faith and fair dealing, and promissory estoppel claims is an allegation of an independent agreement for reimbursement of services at the UCR fee. But the facts suggest that Plaintiff's claims arise not from a freestanding agreement reached between Advanced Orthopedics and Oxford, but flow from the insured's plan which provides coverage for services provided by out-of-network providers. Plaintiff has not alleged an "ad hoc arrangement[] in which the provider agrees to render services (which are *not* covered by the terms of the plan)." *Plastic Surgery Ctr., P.A.*, 967 F.3d at 229. Conversely, Plaintiff alleges only that (1) the hospital contacted Oxford and obtained preauthorization which was tendered under confirmation number 108221092; (2) Plaintiff reasonably relied on Oxford's pre-authorization; and (3) reasonably understood based on state coverage law mandates and prior course of dealing with Oxford that the pre-authorization of services contemplated payment of 100 percent of Plaintiff's UCR charges. (*See* Compl. ¶¶ 17, 19, 21.) And these allegations, as they relate to payment of the UCR fee, are belied by the insured's

---

[6] *See Boldrini v. Wilson*, 542 F. App'x 152, 155 (3d Cir. 2013) ("Where there is a disparity between a written instrument annexed to a pleading and an allegation in the pleading . . . the written instrument will control.") (internal quotations and citation omitted).

plan and the pre-authorization letter. The plan indicates that covered persons may go to non-network providers with the caveat that it generally pays a lower level of benefits when covered services and supplies are not furnished by in-network providers. (*See* Health Benefit Plan, p. 20.) Moreover, the pre-authorization letter advises that any payment is based on the "[t]erms, conditions and limitations of the Member's health benefits plan." (Pre-authorization Letter, p. 1.).

Consequently, as the allegations stand, I find no separate agreement. Instead, Plaintiff's implied contract, breach of warranty of good faith and fair dealing, and promissory estoppel claims "relate" to an ERISA plan, because the pre-authorization letter indicates that the insurer looks to the ERISA plan to determine both the scope of any services eligible for reimbursement, and the amount of any subsequent payment. As such, these claims are premised on an ERISA plan, and accordingly, are preempted. Plaintiff's unjust enrichment claim also involves an impermissible "reference" to an ERISA plan. As explained above, to state an unjust enrichment claim under New Jersey law, a plaintiff must show, in part, that Oxford "received a benefit and that retention of that benefit without payment would be unjust." *Plastic Surgery Ctr., P.A.*, 967 F.3d at 240 (quoting *Thieme v. Aucoin-Thieme*, 227 N.J. 269 (2016)). And, similar to the unjust enrichment claim in *Plastic Surgery Center*, here, the "benefit conferred" is premised on the existence of the plan because "where a healthcare provider claims unjust enrichment against an insurer, the benefit conferred, if any is not the provision of the healthcare services *per se*, but rather the discharge of the obligation the insurer owes to its insured." *Id*. Therefore, Plaintiff's unjust enrichment claim is also preempted.

In sum, absent further allegations of a separate arrangement, I find that Plaintiff's common law claims are claims for benefits due under K.G.'s plan. Accordingly, these claims are preempted and therefore, dismissed without prejudice.

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion to dismiss Plaintiff's Complaint is **GRANTED**. Nonetheless, to the extent Plaintiff believes it can plead additional facts that demonstrate an independent agreement between the parties for reimbursement at Advanced Orthopedics' UCR fee and/or reliance on a prior course of dealing, Plaintiff is given leave to amend its complaint within 30 days from the date of this Opinion and the accompanying Order.

**DATED**: May 27, 2022

/s/ Freda L. Wolfson
Hon. Freda L. Wolfson
U.S. Chief District Judge
